**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| **ANANDA CAMARGO CHAVEZ**, individually and on behalf of a class of all persons and entities similarly situated,<br><br>*Plaintiff,*<br>v.<br><br>**REBUILT BROKERAGE LLC d/b/a REBUILT REALTY AND REBUILT OFFERS LLC.**<br><br>*Defendants.* | Case No. 1:24-cv-00504-RP<br><br>Presiding: **Hon. Robert Pitman** |

## EXPERT DECLARATION OF AARON WOOLFSON

I, Aaron Woolfson, state and declare as follows:

1. I have been retained by Plaintiff's counsel to provide structure to, and then analyze, the electronic Call Detail Records ("CDR" or "CDRs"), and other associated information that has been, or will be, provided in this lawsuit reflecting the texting done by The Rebuilt Brokerage, LLC d/b/a Rebuilt Realty and Rebuilt Offers LLC. ("Rebuilt Brokerage LLC" or "Rebuilt" or "Defendant").

2. More specifically, I have been asked to opine whether there is a reliable method to identify which texts in CDR reports maintained by Defendant's texting platform vendor, MessageMedia, were (a) sent to telephone numbers that had been on the national Do-Not-Call ("DNC") list for more than thirty (30) days, and where there were two (2) or more texts delivered to the number within 365 days.

3. I have also been asked to identify whether there is a reliable manner to identify those telephone numbers to which messages had been sent where the number had sent a STOP request, and messages had continued to be sent to those numbers more than thirty (30) days after

1

Declaration of Aaron Woolfson                                   Case No. 1:24-cv-00504-RP

the request.

4. As described in this declaration, it is my conclusion that using CDR reports that were produced by MessageMedia pursuant to a subpoena in this matter there is a reliable method to identify the following: (a) texts to numbers that were on the national DNC list for more than thirty (30) days, and there were two (2) or more texts to that number within 365 days; and, (b) numbers to which messages were sent more than thirty (30) days after the Defendants' receipt of STOP.

5. I was not retained in this matter to determine the legal standards of any court decisions or their applicability to this case, and I was not involved in the sampling or selection of data provided by the Defendants. This report reflects the results of my study of the underlying facts, independent analysis of the data and documents provided by MessageMedia to counsel for Plaintiff, and third parties. My rate is $440.00 per hour for expert engagements, and $675.00 per hour for depositions, trial, and arbitration appearances.

6. I am personally familiar with the matters that are contained within this declaration, and if called to testify, I can accurately and competently testify as to them.

**Qualifications and Expert Engagements.**

7. I have over 25 years of experience in developing and analyzing databases and telephone systems and establishing the interfaces between telephone systems and the networks that convey calls. I have implemented call recording and call data collection and retention systems for commercial, government, aerospace, telecommunications, and payroll industries. My professional experience includes serving as an expert witness in cases where I evaluated the technical aspects of telephone systems, including whether they had a random or sequential number generator.

8. My qualifications and curriculum vitae are attached to this expert report as Exhibit 1. A list of the other cases in which I have testified as an expert at trial or by deposition during the previous four years is attached as Exhibit 2. I have been qualified by both Federal and

2

Declaration of Aaron Woolfson　　　　　　　　　　　　　　　　　　　Case No. 1:24-cv-00504-RP

State courts.[1]  My testimony has been relied upon by courts in both individual and class actions,[2] by plaintiffs and defendants. My opinions have also been relied upon in arbitrations, including those involving TCPA claims.

9. I was the developer of the automated Verification of Deposit ("VOD") and Verification of Mortgage ("VOM") system that was used by Chase, Wells Fargo, Bank of America, as well as some regional banks and mortgage lenders, to facilitate the review of mortgage applications by call center staff.  These systems required a great deal of integration between the telephone systems and the financial institution's computer systems, and relied heavily on my deep understanding of database and timekeeping integration technologies.  It also required me to build interfaces to the ACH[3] exchanges, and with Global Payments and other large automated electronic inter-exchanges of financial information.  Other processes necessitated integrating fax and OCR[4] capabilities as well as enhanced call routing – inbound and outbound – including predictive elements of enhanced call processing, and the precise timings of these events.

10. I am the inventor of "Canvas", a programming language that I developed for interfacing between telephone systems and telephone networks, capable of processing hundreds of thousands of calls a day.  To date, hundreds of millions of calls have been handled by Canvas on

---

[1] *ABM Industries Overtime Cases* (Case No. JCCP 4502, San Francisco Superior Court) (2017) 19 Cal. App. 5th 277, footnote 5, at page 8, ("[T]here was evidence in the record that Woolfson had previously qualified as an expert in both state and federal court ...") (*ABM Industries Overtime Cases*, A132387, A133077, A133695, 19 Cal. App. 5th 277 (Dec. 11, 2017; pub. ord. Jan. 10, 2018)). (Exhibit 3).

[2] "The Court notes that Mr. Woolfson's expert report appears to include information related to the merits of the case in addition to class certification issues." *Gaines v. Law Office of Patenaude & Felix, A.P.C.*, Case No. 3:13-cv-01556-JLS-DHB (S.D. Cal.), Sep. 21, 2015, ECF 132, at 3.

[3] Automated Clearing House ("ACH").

[4] The OCR ("Optical Character Recognition") process as integrated into the automatic monitoring of telephone calls in real time to determine whether the call was a voice or fax call, and if a fax call, decoding the contents of each fax-page into machine readable text *while* a fax was being transmitted to the bank's computers for integration with a database.

behalf of call centers, financial institutions, conference calling companies, and organizations offering Interactive Voice Response ("IVR") services.[5]

11. I have developed highly available, upwardly scalable databases for use in the telecommunications industry. The databases and telephone systems that I have personally developed and/or coded are used by telephone companies and call centers throughout the United States and Canada to catalogue and index various customer-calling activities. Some of the companies that have used my databases and/or telephone equipment (which I personally created and manufactured) have included Japan Telecom, Experian, Bank of America, Wells Fargo Bank, JP Morgan, Bank of the West, Cogent Communications, Zone Telecom (ANPI), Aion Networks, Smartcall Conferencing, and First National Collection Bureau, Inc., and the United States government, including the Department of Justice.

12. Through my hands-on work experience in developing databases and telephone systems, I have become very familiar with the technology related to telephone systems and their interfaces with the networks through which calls are processed, received, and transmitted. I am also familiar with how dialing systems work, and how telephone systems handle inbound and outbound calls.

13. I have been responsible for the design and development of specialized hardware and software systems that are highly dependent upon the capabilities of the computers upon which they run, and are in use at mission-critical applications, including Patriot Missile (SAIC, Patriot RTOS), Air Traffic Control Systems (Kongsberg Geospatial Corporation), and Point Lepreau Nuclear Generating Station, New Brunswick, Canada (Energié NB).

14. I held a Certificate of Public Convenience and Necessity[6] ("CPCN") – a special license and compliance certification granted to companies that provide essential public services,

---

[5] IVR is a technology that allows a computer to interact with humans through the use of voice and/or DTMF tones inputted via a telephone keypad. DTMF ("Dual Tone Multi Frequency") is the signal you generate when you press a telephone's touch keys.

[6] Certificate of Convenience and Necessity U-5410-C granted to TelSwitch, Inc. on 06-10-1994 (footnote continued)

4

Declaration of Aaron Woolfson                                    Case No. 1:24-cv-00504-RP

such as telephone corporations. The California Public Utilities Commission granted my most recent CPCN on July 18, 2017. This was a re-issue of my initial CPCN granted to TelSwitch, Inc. on June 10, 1994, which I held for approximately eighteen (18) years before taking a hiatus from providing public telephone services. The license originally granted to me in 1994 allowed me to interconnect the equipment that I designed, built and programmed, with the phone network for the purpose of providing wholesale and retail telecommunications services.

15. I have also been qualified as an expert in matters involving the TCPA and have previously been engaged on behalf of defendants and plaintiffs to analyze records of calls and, among other things, compare call records for their inclusion on the national DNC list.

16. For example, in *Wright v. eXp Realty, LLC*, No. 6:18-cv-01851-PGB-EJK (M.D. Fla.), I was engaged on behalf of defendant eXp to analyze call records and, among other things, compare them against records of leads from various sources, and to identify which numbers were authoritatively associated with telephone companies on the dates that the calls were made.

**Expertise Specifically Related to Database Work.**

17. I was relied upon as an expert witness in the case of *Hines v. KFC*, filed in the United States District Court, Southern District of California (Case No. 09cv2422 JM (POR)). In *Hines*, the court granted plaintiff's motion for class certification and certified plaintiff's meal period and rest break claims based on my analysis after finding that I am an "expert in the compilation and analysis of databases …."

18. I was expert for the plaintiffs in *Albert H. Cicairos, Frank A. Daniel, Richard Wheeler and George Thompson v Summit Logistics, Inc.* and *Kenneth Bluford v Safeway Stores, Inc.* (Case No. CV014837 [Consolidated with Case No. CV028541] Superior Court of California, County of San Joaquin).

19. In addition, I served as an expert in the *ABM Industries Overtime Cases* (Case No. JCCP 4502, San Francisco Superior Court). Relying upon my expert finding, the Appellate Court

---

(Decision 94-06-022). Reissued as U-7327-C on 07-18-2017 (Decision 17-07-009).

reversed the trial court's ruling and certified the plaintiffs' proposed wage and hour classes. The court noted that there was sufficient evidence contained within my expert report to support certification of the classes and subclasses, and that my experience was sufficient to allow my expert report to be admitted as evidence for that purpose. (Exhibit 3).

20. I was also expert in *Beatriz Aldapa And Elmer Avalos v. Fowler Packing Company, Inc., Ag Force, LLC, Fowler Marketing International LLC,* (Case No. 1:15-CV-00420-DAD-SAB ED, Ca.), where the employer used Datatech to maintain an accounting of piece-work and non-piece-work hours worked by agricultural workers. The court order in *Fowler Packing* is attached as Exhibit 4.

21. I have applied similar methods to structure large amounts of unstructured data on behalf of defendants Verizon Wireless and Collecto in *Lofton v. Verizon* (Case No. 3:13-cv-05665) and *Lofton v. Collecto* (Case No. 4:13-cv-03293-YGR). In *Lofton v. Collecto*, I was ordered by the District Court of the Northern District of California to reconstruct a database from information that was in Verizon's possession that the plaintiff stated was "un-structurable" and useless for purposes of analysis and determination of the results of calls that took place. I was able to complete the re-structuring of Verizon's data so that the parties could reach a successful settlement. The portion of the Court's Order from *Lofton v. Verizon* instructing me to create a database from Verizon's unstructured data is attached as Exhibit 5.

**Expertise Specifically Related to Outbound Dialing Systems in Call Centers.**

22. I have over twenty-five years of hands-on experience in telecommunications, in the design and programming of the equipment that handles calls. In specific, I was responsible for the development of specialized hardware and software systems, called Rapid Announce and Rapid Record that have been used in both telephone company central offices and in call centers, for the pacing, dialing, and measurement of phone calls, and has cumulatively handled hundreds of millions of calls. At its peak use, Rapid Announce processed 240,000 inbound and 280,000 outbound calls per day for companies such as First National Collection Bureau.

23. Rapid Announce was primarily used to match the pacing of outbound calls with

the availability of agents to accept the calls once they were answered. Rapid Announce also evaluated the connected calls to determine whether the phone was answered by an answering machine or a live person. Based upon the availability of the agents and the type of call that was being placed, the system would then transfer the call to the correct type of agent, or skill-set group, to handle the particular circumstances for which the call was received, or dialed.

24. Rapid Record was responsible for handling the recording and media storage of inbound calls, as well as the implementation of a technology that I developed called AggravationSense. AggravationSense was designed to measure the cadence and speed at which an individual spoke. By measuring the cadence and speed of the speech against a baseline of background noise, AggravationSense would proactively patch in a customer service supervisor in advance of any party asking to speak with one.

**Materials and Documents Reviewed and Relied Upon.**

25. In conducting my analysis and preparing my conclusions and opinions, I relied upon the following materials and information:

I. **Materials that I relied upon in connection with my Declaration:**

(a) The Complaint (ECF No. 1); and,

(b) Call Detail Records:
"All History - Last 4 months.csv" (.csv file)
"data_202310_202311.tsv" (tsv file[7])
"data_202312_202401.tsv" (tsv file)
"data_202402_202406.tsv" (tsv file)
"data_202403_202407.tsv" (tsv file)
"data_202407_202411.tsv" (tsv file)
"data_202408_202411.tsv" (tsv file)

---

[7] "Tab Separated Values" (or "TSV") is a format for data by which [tab] is used within a text file to delineate between various columns of data contained within a text file in columnar format. It is also used where there are also commas within a file so that the alignment within the data structures is maintained.

7

Declaration of Aaron Woolfson                                    Case No. 1:24-cv-00504-RP

## II. Electronic database resources that are available to me:

(a) The National Exchange Carrier Association ("NECA") North American Numbering Plan 1000-block assignments database.

(b) External, publicly available databases, including iConectiv's WDNC[8,9] for use in identifying the type of line (and the carrier) and the Federal TCPA-eligible area code (and DNC) list that is published daily by the FTC[10].

**Methods and Tools Used to analyze Records.**

26.  I create and analyze databases using Structured Query Language (SQL). A database is a computerized compilation of data organized into tables, each table having columns (attributes), with column headings, and rows of information. Tables that share at least one attribute in common are "related." Tables without a common attribute may still be related via other tables with which they do share a common attribute. The pathways relating those separate tables are called "joins." Once tables have been related by a join, a user may view the combined information in the joined tables to derive new and/or useful information. To access such information, a user sends queries to the database, which executes the queries and retrieves the requested information from the tables in the database. A database, however, only recognizes queries written in complex "query languages." The most common query language is SQL. A proper query in this language consists of one or more "clauses." Common types of clauses are

---

[8] FCC order FCC-15-35A1 (03/27/2015) explicitly mandated *continued* availability of iConectiv's data for purposes of compliance with the TCPA. (¶.142). The historical information *does not* contain subscriber information, only carrier of record and line type. Before number portability, this would have been a simple task of looking at the Local Exchange Routing Guide ("LERG"), or absent access to the LERG, finding the area codes and prefixes from an online collection of national phone books. TelSwitch, Inc. is a reseller and authorized user of iConectiv data.

[9] In *Perrong v Call Identified as Connor* (Case No. 1:22-cv-04479-CPO-EAP, DC, New Jersey, Camden Vicinage), "plaintiff has queried the database of iConectiv, the company charged by the Federal Communications Commission to administer the Number Portability Administration Center, which is the master database which lists which telephone provider services a particular number, among other information required to route telephone calls to the proper provider" (ECF 3)

[10] TelSwitch, Inc's FTC Organization ID is 10159990-70991, Subscription Account Number (SAN) 10376173-476173-21.

SELECT, WHERE, FROM, HAVING, ORDER BY, and GROUP BY clauses. Thus, to compose a proper inquiry, a user must understand the structure and content of the relational database as well as the syntax of the specific query language.

27. By using a set of standardized SQL queries, I am able to tag each of the records within the CDR reports according to (a) the date of a text; and (b) the disposition of the text message, if one is present; and; and (d) any other data field contained in the call records. I am also able to add (e) whether the number was on the national Do-Not-Call list, and if so, when it was added; and (f) whether the number appears in any other file that was produced, such as on lead lists or summary sheets. I also was able to identify those messages that were *received* by the Defendant that had indicated "STOP".

28. Using SQL, I am able to also associate other information that is extrinsic to the worksheets provided that may provide additional guidance to the trier of fact, such as the name of the telephone company to which the number was serviced by on the date that the number was called.

**Steps I take when Organizing and Analyzing Call Detail Records.**

29. I start by opening each of the files that contain call detail records data (collectively referred to as "Call Detail Records" or "CDRs"). I do this to (a) determine the format that the text records were stored in, and then (b) to determine what pre-processing I would need to conduct in order to achieve an import of the records for in advance of any analysis.[11]

30. I then import the CDRs file into SQL database tables using Microsoft SQL™ Service Management Studio to apply a set of filters to include only texts to valid telephone numbers that:

---

[11] I typically do not need to apply any pre-process to the CDRs, as most CDRs originate from electronic call data capture systems that are already Electronic Data Interface ("EDI") capable.

    a. Were sent to a number that contained precisely ten digits; and,

    b. Were sent to a number that started with a 2 through 9; and,

    c. Were contained within structurable data[12]; and,

    d. Had an associated date; and,

    e. Were sent to area codes that were subject to the TCPA, according to the FTC (Exhibit 6); and,

    f. Contained an indication that the number to which a text message had been sent had an indication of "delivered."

    g. Indicated that the number to which the text was sent had been on the national DNC list for more than thirty (30) days; and,

    h. Whether a number to which the message had been sent had received two (2) or more text messages within 365 days.

    i. Whether a number to which the message had been sent had requested "STOP", and whether texts had been sent more than thirty (30) days after the request was received by the Defendants.

31. I also prepared the framework for a set of data files that can be used to exchange with the telephone companies that can be used to identify the subscriber to the telephone number, based upon a well-defined format called an Electronic Data Interchange ("EDI") format, to query the telephone company databases in order to obtain the subscribership information.

**Telephone Companies databases maintain subscriber information and residential / business line classifications in electronic format as part of their standard record keeping.**

32. Wireless and wireline carriers maintain historical records that can be used to

---

[12] I conducted this to confirm that the calls were structurable and conformed to a normalized database layout specification in which data is aligned to the designated columns. (e.g. all data was contained in the columns allocated for that proper data type).

identify the residential or business classification for any particular phone number, as well as contact information (Exhibit 7, properly redacted) As part of record-keeping requirements imposed upon them by the FCC, telephone companies must maintain those items for the reporting of residential and business line classifications, as well as being able to respond to subpoenas. They also use this information to route customer service calls to the correct residential or business service center.

33. The line type and customer information attributes are also maintained to support local-number-portability ("LNP") requests. In other words, when someone wishes to move their number from one carrier to another, they are required to provide certain requisite information, such a name and contact information, which must match then match the other carrier's records from where the number was being ported. These exchanges of port-in/port-out requests are handled electronically, and exchanged between and amongst the phone carriers[13] using a process called Electronic Data Interchange ("EDI") protocol. The EDI process encompasses a well-defined, regimented set of informational exchanges, and provides an efficient manner to handle, and route, port-in and port-out requests using a common set of data attributes.

34. I have become familiar with the manner in which telephone companies maintain these records to handle their own customer service and reporting requirements, as well as to provide support for the EDI protocol. Both in my role in providing billing and customer service software to phone companies, and in my role as a consulting expert for phone companies who are involved in litigation, I am familiar with the type of information that phone companies maintain on behalf of their customers.

---

[13] LNP includes both non-mobile and mobile carriers. Companies, regardless of the carrier type are required to support Local Number Portability ("LNP"). The National Portability Administration Center ("NPAC") is responsible for maintaining the database of the national numbering inventory, and as part of the FCC's order granting authority to iConnectiv to maintain this, they agreed to continue to make data available for TCPA compliance purposes. (FCC 15-35, ¶ 142).

35.     As an example, I was the expert for Verizon Wireless in *Lofton v. Verizon Wireless (VAW) LLC*, No. 13-cv-05665-YGR (N.D. Cal.). In the course of my work on that case, I came to understand that Verizon Wireless maintained records of which numbers were residential or business subscribers.  In addition, I learned which types of information, which included line subscribership details that were maintained on a historical basis. Similarly, I am aware that other companies, such as AT&T Wireless and T-Mobile, maintain similar information for both compliance and customer support purposes. This information is also maintained so that calls for invoicing purposes can be rated and billed properly, and so that subpoenas can be properly responded to.

36.     I also formerly ran a consumer telephone company, called Tel-One Network Services, which was similarly expected to maintain both business and residential information on subscribers' numbers, as well as contact information. Part of my responsibility at Tel-One Network Services was to interface with other telephone companies such as Pacific Bell (now AT&T) during the process of onboarding new subscribers, because we had to work with the proper business or residential department, depending upon the type of the product being offered.

**<u>Waterfall Analysis 1</u>. Steps that I applied to the Defendant's Data to conduct an analysis of the Call Detail Records to determine the unique quantities of telephone numbers, and the total number of texts that were sent to those numbers, where the number was on the national DNC list for more than thirty (30) days, and the message count quantity indicated that the number was sent text messages (2) or more times within 365 days.**

37.     I started with the set of data that was provided, which included 10,809,427 text messages within the source files listed in paragraph 25(I)(b). I started by removing 24,021 messages that were sent to numbers that were to area codes that were not on the FTC's index of TCPA-eligible area code.  I then removed 4,147,593 duplicate texts where the same text had been sent multiple times at the same time I then removed 8,416 records where there was an indication that the message was *inbound* and placed them into a

12

Declaration of Aaron Woolfson                                                             Case No. 1:24-cv-00504-RP

1  labeled *dbo.inbound* so that I could further determine whether those messages contained a

2  STOP request.  I also removed 2,722,037 messages sent where the disposition on the text

3  indicated the message had not been delivered to the handset.  This left a total of 3,907,360

4  text messages.

5        38.    From the remaining 3,907,360 text messages, I removed 136,810 text

6  messages to numbers where there was an inbound message that had indicated a possible

7  interest in the product or service offered by the Defendants[14].  This left a total of

8  3,770,550 texts.

---

[14] I categorized the responses received by Defendants into two buckets – *dbo.stop* and *dbo*.interested.  Any message that contained the following was placed in *dbo.stop* while the remaining messages were placed in *dbo.interested*:  Any messages to any numbers that had replied with phrases that was *not* within the *dbo.stop* category were excluded from analysis.  Stop requests included: "Stop!!!!!!!!!", "Stop texting me!!!!", "Stop sending me messages", "Stop\nThank you \nTammy Conti\nMountains to Lakes R.E.\n865.233.9623", "Stop reply", "Stop harassing me please", "Stop texting me from different numbers", "Stop ??", "Stop....", "Dontnou", "Stop\nHarold Plemons EXIT Realty", "STOP\n", "Stop to opt-out", "Stop send me your house can't open your link", "Stop. Wrong number.", "Stop calling me wrong person", "Stop sending please", "Stop!!!!!", "STOP \n\nPlease only email me at info@alphaainvestments.com", "Stop,I texted yesterday.", "STOP This is not Richard", "STOP MESSAGING ME", "Stop sending me stuff I'm not interested", "Not sure how many times I have to say stop you guys keep emailing me I keep saying stop you keep saying you get it and I still get these stupid text", "Stop fuck. Off", "STOPP", "Stop. This is not daylight homes", "Stop please", "Stope", "\nFucking stop", "?. STOP", "Stop!!!", "Stoppp!!", "Stop to opt out", "Stop!", "STOP TEXTING ME!!!!!!!!!", "Stop\n\n", "Unsubscribe", "Stop sending me this shit", "Not stop", "Stop texting me, I am not William, I don't want your text ant buying and ant selling", "STOP\n\nReply STOP to unsubscribe", "All right stop", "Stop texting me", "Please fucking STOP", "Stop¶Harold Plemons EXIT Realty", "STOP\nVickie Vernon C21 Realtor", "STOP¶", "Stop. Stop. Stop", "I said fucking stop", "Smaug.io/9swz. Stop", "Stop send", "Stop already asked to please stop, please honor this request", "Don't sent again", "Unsubscribe, please", "Whatever just stop", "Stop it immediately", "Stop sending me these !!!!", "Stop \nSandra N. Marquez, CESP American Guaranty Title nText STOP to opt out", "Stop sending me stuff", "Stop ya Deven de chingar", "don't fuck with me", "Yo stop spamming me", "Stop sending me texts please", "Stop sending me this crap", "Don't insult me", "Stop bitch", "Stop send me messages am not that bitch rose fuckers", "Stop already!", "stop  =", "Stop out", "Stop ðŸ›' ", "STOP!!!!", "Stop texting email only", "Stop. Put this number on your do not call list and never contact again. Got it lib.", "Stop texting", "Stop text me", "Oh my god stop it", "Stop sending me these texts please", "stop sending please !", "STOPG", "Stop to opt_out.", "STOP", "Stop fucking texting me!!!!!!", "STOP-do no contact again-moved to Florida!!", "Stopped knocked out", "STOP! ?"

---

39. From the remaining 3,770,550 text messages, I removed 1,831,764 records that indicated messages sent to that number that were either (a) not on the national DNC list, or (b) were on the national DNC list, but was not on the National DNC list for more than thirty (30) days from the most recent date field. I then removed 1,123 records where the tagging, as indicated within the SQL database with a YES in the field labeled *is2orMore365* indicated *less than* two (2) texts were sent to that number within 365 days.

40. The following illustration identifies the steps that I undertook while organizing and analyzing the data.

| Step | Count | Remaining |
|---|---|---|
| All items within "Defendant Call Records" files [callLogs]: **Production:** csv files: 9,844,249; tsv files: 965,178 | 10,809,427 | 10,809,427 |
| Removal of any number that was not part of the FTC's list of valid TCPA-eligible north american numbering plan destination area codes, or records indicating a telephone number that was not ten digits, or the record did not have a properly formatted date/time. | (24,021) | 10,785,406 |
| Removal of any duplicate text records (e.g. Removal of any records from the remaining call detail records ("CDR") where the text was contained within the production in duplicity. | (4,147,593) | 6,637,813 |
| remove any records that indicated an inbound text | (8,416) | 6,629,397 |
| removal of any text that did not indicate "Message delivered to the handset" in the status. | (2,722,037) | 3,907,360 |
| Removal of all texts to those numbers that had replied with a text, but the body of the reply message sent to defendant indicated a *possible interest* in the product or service. | (136,810) | 3,770,550 |
| Removal of any texts to a number that was not on the DNC list, or was to a number that was on the national DNC list, but for for more than thirty (30) days before delivery of the text. | (1,831,764) | 1,938,786 |
| Removal of any texts to a number that was on the DNC list for more than thirty (30) days before delivery of the text, but there were not two (2) or more calls to that number with 365 days. | (1,123) | 1,937,663 |
| Quantity of unique numbers to which the 1,937,663 texts were sent, where there were two (2) or more texts sent to that number within 365 days, including twenty-two (22) text messages sent to the Named Plaintiff's number ending in -1523. | | 13,115 |

41. I was able to determine that there were 1,937,663 texts that were sent to 13,115 unique numbers, where the number to which the text was sent had been on the

national DNC list for more than thirty (30) days and the number had received two or more texts within 365 days. This includes twenty-two (22) texts to the Named Plaintiff's number ending in -1523:

| source | date_added | direction | to | body | status | error_text |
|---|---|---|---|---|---|---|
| csv | 4/15/2024 20:19 | out | -1523 | Javier, Rebuilt has a price reduction | Sent | Message delivered to the handset |
| csv | 11/14/2023 17:10 | out | -1523 | Javier, Rebuilt has a new deal availa | Sent | Message delivered to the handset |
| csv | 4/22/2024 21:46 | out | -1523 | Javier, Rebuilt has a price reduction | Sent | Message delivered to the handset |
| csv | 4/8/2024 20:56 | out | -1523 | Javier, Rebuilt has a price reduction | Sent | Message delivered to the handset |
| csv | 5/6/2024 18:26 | out | -1523 | Javier, Rebuilt has a new deal availa | Sent | Message delivered to the handset |
| csv | 4/22/2024 21:50 | out | -1523 | Javier, Rebuilt has a price reduction | Sent | Message delivered to the handset |
| csv | 11/14/2023 22:58 | out | -1523 | Javier, Rebuilt has a price reduction | Sent | Message delivered to the handset |
| csv | 5/10/2024 19:13 | out | -1523 | Javier, Rebuilt has a new deal availa | Sent | Message delivered to the handset |
| csv | 4/15/2024 21:11 | out | -1523 | Javier, Rebuilt has a price reduction | Sent | Message delivered to the handset |
| csv | 12/27/2023 18:50 | out | -1523 | Javier, Rebuilt has a new deal availa | Sent | Message delivered to the handset |
| csv | 12/8/2023 15:09 | out | -1523 | Javier, Rebuilt has a new deal availa | Sent | Message delivered to the handset |
| csv | 5/8/2024 19:10 | out | -1523 | Javier, Rebuilt has a price reduction | Sent | Message delivered to the handset |
| csv | 5/1/2024 12:03 | out | -1523 | Javier, Rebuilt has a new deal availa | Sent | Message delivered to the handset |
| csv | 4/8/2024 20:54 | out | -1523 | Javier, Rebuilt has a price reduction | Sent | Message delivered to the handset |
| csv | 4/29/2024 20:15 | out | -1523 | Javier, Rebuilt has a price reduction | Sent | Message delivered to the handset |
| csv | 4/15/2024 21:14 | out | -1523 | Javier, Rebuilt has a price reduction | Sent | Message delivered to the handset |
| csv | 4/9/2024 19:03 | out | -1523 | Javier, Rebuilt has a new deal availa | Sent | Message delivered to the handset |
| csv | 3/27/2024 13:47 | out | -1523 | Javier, Rebuilt has a new deal availa | Sent | Message delivered to the handset |
| csv | 3/29/2024 13:33 | out | -1523 | Javier, Rebuilt has a new deal availa | Sent | Message delivered to the handset |
| csv | 5/13/2024 19:02 | out | -1523 | Javier, Rebuilt has a price reduction | Sent | Message delivered to the handset |
| csv | 5/7/2024 12:02 | out | -1523 | Javier, Rebuilt has a price reduction | Sent | Message delivered to the handset |
| csv | 5/1/2024 19:28 | out | -1523 | Javier, Rebuilt has a price reduction | Sent | Message delivered to the handset |

(22 row(s) affected)

**Waterfall Analysis 2**. Steps that I applied to the Defendant's Data to conduct an analysis of the Call Detail Records to determine the unique quantities of telephone numbers, and the total number of texts that were sent to those numbers, more than thirty (30) days after the receipt of a STOP request.

42. I started with the set of data that was provided, which included 10,809,427 text messages within the source file listed in paragraph 25(I)(b). I started by removing 24,021 messages that were sent to numbers that were to area codes that were not on the FTC's index of TCPA-eligible area code. I then removed 4,147,593 duplicate texts where the same text had been sent multiple times at the same time. I then removed 8,416 records where there was an indication that the message was *inbound* and placed them into a labeled *dbo.inbound* so that I could further determine whether those messages contained a STOP request. Finally, I removed 2,722,037 messages sent where the disposition on the text indicated the message had not been delivered to the handset. This left a total of 3,907,360 text messages.

43.     From the remaining 3,907,360 text messages, I removed 136,810 text messages to numbers where there was an inbound message that had indicated a possible interest in the product or service offered by the Defendants. This left a total of 3,770,550 texts.

44.     From the remaining 3,770,550 text messages, I removed 3,521,363 records where the number to which the message was sent had *never* requested STOP. I then removed 241,654 messages that were sent *to* number *that had* requested STOP, but that the messages were not sent to that number more than thirty (30) days after the stop.

45.     The following illustration identifies the steps that I undertook while organizing and analyzing the data.

| Step | Removed | Remaining |
|---|---|---|
| All items within "Defendant Call Records" files [callLogs]: Production: csv files: 9,844,249; tsv files: 965,178 | | 10,809,427 |
| | | 10,809,427 |
| Removal of any number that was not part of the FTC's list of valid TCPA-eligible north american numbering plan destination area codes, or records indicating a telephone number that was not ten digits, or the record did not have a properly formatted date/time. | (24,021) | 10,785,406 |
| Removal of any duplicate text records (e.g. Removal of any records from the remaining call detail records ("CDR") where the text was contained within the production in duplicity. | (4,147,593) | 6,637,813 |
| remove any records that indicated an inbound text | (8,416) | 6,629,397 |
| removal of any text that did not indicate "Message delivered to the handset" in the status. | (2,722,037) | 3,907,360 |
| Removal of all texts to those numbers that had replied with a text, but the body of the reply message sent *to* defendant indicated a *possible interest* in the product or service. | (136,810) | 3,770,550 |
| Removal of any text message to *any* number where there was not a STOP request received by the Defendant. | (3,521,363) | 249,187 |
| Removal of any text message that was sent to a number that had requested STOP, but the message was either (a) sent before the STOP, or (b) sent less than thirty (30) days after STOP. | (241,654) | 7,533 |
| Quantity of unique numbers to which the 7,533 texts were sent, where there were the number to which the message was sent had sent a STOP request, and there were texts that had been sent to that number more than thirty (30) days after the receipt of the STOP. | | 189 |

46. I was able to determine that there were 7,553 texts that were sent to 189 unique numbers, where the number to which the text was sent one or more messages *more than thirty* (30) days *after* the receipt of a STOP request by the Defendant.

47. The following illustrates messages that had been sent more than thirty (30) days *after* a STOP request had been received by Defendant:

| source | to | body | | status | |
|---|---|---|---|---|---|
| tsv | 6/11/2024 20:45 | -3522 | You have successfully been removed from our contact list | | |
| csv | 7/22/2024 19:48 | -3522 | Hey there! 4 new price drops in Arkansas and Tennessee! \n | Sent | Message delivered to the handset |
| tsv | 7/23/2024 3:48 | -3522 | Hey there! 4 new price drops in Arkansas and Tennessee! ¶¶ | Sent | Message delivered to the handset |
| csv | 7/24/2024 15:32 | -3522 | GOLDSTAR HOMES LLC, Rebuilt has a new deal available!\n\ | Sent | Message delivered to the handset |
| csv | 7/24/2024 17:01 | -3522 | GOLDSTAR HOMES LLC, Rebuilt has a price reduction! \n\nPr | Sent | Message delivered to the handset |
| tsv | 7/24/2024 23:32 | -3522 | GOLDSTAR HOMES LLC, Rebuilt has a new deal available!¶¶ | Sent | Message delivered to the handset |
| tsv | 7/25/2024 1:01 | -3522 | GOLDSTAR HOMES LLC, Rebuilt has a price reduction! ¶¶Pro | Sent | Message delivered to the handset |
| csv | 7/25/2024 18:36 | -3522 | Hey! Don't miss out on 3 new listings that fit your criteria.\n | Sent | Message delivered to the handset |
| tsv | 7/26/2024 2:36 | -3522 | Hey! Don't miss out on 3 new listings that fit your criteria.¶¶ | Sent | Message delivered to the handset |
| csv | 7/29/2024 20:55 | -3522 | Good day! Check out 12 new price drops in your target areas | Sent | Message delivered to the handset |
| tsv | 7/30/2024 4:55 | -3522 | Good day! Check out 12 new price drops in your target areas | Sent | Message delivered to the handset |
| csv | 7/30/2024 15:06 | -3522 | GOLDSTAR HOMES LLC, Rebuilt has a new deal available!\n\ | Sent | Message delivered to the handset |
| tsv | 7/30/2024 23:06 | -3522 | GOLDSTAR HOMES LLC, Rebuilt has a new deal available!¶¶ | Sent | Message delivered to the handset |

48. Attached as Exhibit 8 are the SQL queries that I ran to conduct my analysis. Exhibit 9 contains a summary of the results of the analysis related to waterfall analysis.

49. Finally, I was asked to identify whether any of the 189 numbers that had been sent messages more than thirty (30) days *after* a STOP request, had been sent a message acknowledging the STOP request.

50. I was able to identify that, out of the 7,533 messages that were sent to 189 unique numbers that had continued to receive messages more than thirty (30) days *after* STOP, that there were 7,404 messages that had been sent to 187 unique numbers after the Defendant had sent those numbers an acknowledgement that the number was unsubscribed from receiving additional messages with the following message, *"You have successfully been removed from our contact list"*.

1 | I declare under penalty of perjury under the laws of the State of California that the foregoing is
2 | true and correct. Executed this 7th day of March, 2025 in Pleasant Hill, California.

_____
Aaron Woolfson