## THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| ANANDA CAMARGO CHAVEZ, | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | Case No. 1:24-cv-504-RP |
| REBUILT BROKERAGE LLC d/b/a | § | |
| REBUILT REALTY AND REBUILT | § | |
| OFFERS LLC | § | |
| *Defendant.* | § | |

### DEFENDANTS' RESPONSE TO
### PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

COMES NOW, Defendants Rebuilt Brokerage LLC d/b/a Rebuilt Realty and Rebuilt Offers LLC (collectively the "Defendants"), and files this Response to Plaintiff's Motion for Class Certification as follows:

### INTRODUCTION

1.      "Consent often creates an obstacle to TCPA class certification." *Hirsch v. USHealth Advisors, LLC*, 337 F.R.D. 118, 130 (N.D. Tex. 2020). "In *Gene and Gene*, a TCPA consent case, the Fifth Circuit noted that, although TCPA cases involving consent are not *per se* unsuitable for class resolution, certification hinges on each case's unique facts." *Id.* (*citing Gene & Gene LLC v. BioPay LLC*, 541 F.3d 318, 328 (5th Cir. 2008) ("*Gene*"). Under the Fifth Circuit standard set forth in *Gene* and as applied by several district courts, class certification in this matter must be denied, because plaintiff cannot establish a lack of consent that can be proven by general evidence applicable on a class wide basis.

2.      Plaintiff filed suit on May 13, 2024, alleging violations of 47 U.S.C. § 227(c)(5) and 47 C.F.R. § 64.1200(c). Doc. 1. In her Complaint, Plaintiff alleges she received telemarketing calls from Rebuilt, beginning in March 2022 and continuing up until this lawsuit. *Id.* at 5. Plaintiff

1

alleges these text messages were addressed to an individual other than herself. *Id.* at 7. Plaintiff further alleged she had been on the National Do Not Call Registry (the "DNC Registry") prior to receiving any text messages from Rebuilt. *Id.* at 5.

> Plaintiff's Motion for Class Certification proposes a class of:
>
> All persons in the United States whose (1) telephone numbers were on the National Do Not Call Registry for at least 31 days, (2) but who received more than one telemarketing text message from or on behalf of a Rebuilt entity, (3) within a 12-month period (4) as reflected in the data produced by MessageMedia (5) at any time in the period that begins four years before the date of filing this Complaint to trial.

Doc. 34 at 3-4. Plaintiff's Motion for Class Certification refers to a smaller class of "at least 187 class members that were sent telemarketing text messages after they sent a confirmed stop request" but Plaintiff does not formally propose this as a class or a subclass. *Id.* Plaintiff admits she never sent a stop request; therefore, she is not a member of this "smaller class." Doc. 34 at 2-4.

3.     As with in *Gene*, the "the predominant issue of fact" is this matter is undoubtedly one of individual consent." *Id.* (emphasis in original). As the Fifth Circuit held in *Gene*, when "numbers were collected over time and from a variety of sources, individual inquiries of the recipients are necessary to sort out which transmission was consented to and which was not." *Id.* at 328. If "there is no class-wide proof available to decide consent and only mini-trials can determine this issue," then class certification is improper." *Id.* at 329. Rebuilt collected numbers overtime and from a variety of sources—the individuals who submitted their information.

4.     There is no class-wide proof available to decide the issue of consent in this matter. As shown by the declaration of Al Young, CEO of Rebuilt, the numbers were collected over time and from different "sources"—the individuals who submitted their information to Rebuilt—through different systems. Further, as shown by this declaration, Rebuilt adopted a system which required two-factor authentication to receive text messages, starting in April of 2023, shortly after Plaintiff's

number was registered. Plaintiff's class does not account for this change in the system, under which people had to confirm consent twice.[1] Plaintiff claims Rebuilt did not produce any evidence of consent beyond several spreadsheets, but this is inaccurate. Al Young, CEO of Rebuilt, offered testimony in deposition and will offer testimony at trial which contradicts Plaintiff's arguments. Doc. 34. Plaintiff also omits reference to the list of 55,000 people that had successfully opted out of receiving further text messages—none of whom have sued Rebuilt for any alleged TCPA violation in the past. Thus, the evidence Rebuilt has put before this Court is that 1) individuals submitted their own information in order to receive text messages from Rebuilt; 2) in order to submit their information, individuals were required to either consent to receive text messages or given the option of opt out of receiving text messages, depending on when they registered and which system they registered on; 3) any individual who signed up after 2023 was required to two-step authenticate their account, confirming the consent; 4) individuals could opt out of receiving future text messages, and thousands did so successfully; and 5) Rebuilt has no way of determining whether an individual received messages for a different individual, as in Plaintiff's case, or determining whether consent was invalid on an individual account without conducting an investigation into each and every account.

5.      Even if Plaintiff's arguments regarding the lack of proper E-Sign compliance are true, that does not mean that individual class members did not provide consent to be contacted by Rebuilt. Plaintiff's argument relies on holding *any* evidence of consent invalid but offers no way to determine that every individual on Rebuilt's marketing lists never provided consent to be contacted. Finding that all of the consent is invalid would result in an undetermined number of

---

[1] Plaintiff incorrectly claims "And, besides requiring a double-verification process for information submitted to the marketplace website, this lawsuit has not caused the Defendants to change their conduct; Defendants still use MessageMedia." Doc. 34 at 5. Rebuilt introduced the two-factor authentication system a year prior to this lawsuit. Plaintiff's arguments regarding consent are undercut by Plaintiff's inability to recount the background facts accurately.

class members who, with or without E-Sign compliant consent, opted in to receive text messages because they wanted to receive these text messages. These class members have not been harmed and therefore do not have Article III standing to recover in federal court. *See Elzen v. Advisors Ignite USA LLC*, No. 22-C-859, 2024 U.S. Dist. LEXIS 9079, at *13-14 (E.D. Wis. Jan. 18, 2024) (denying class certification in TCPA telemarketing case when Plaintiff could not prove Article III standing on a class wide basis). Plaintiff's proposed class would steeply punish Rebuilt for sending text messages to individuals who wanted them, and reward individuals who have not been harmed in any manner. These members have not been harmed and do not have standing.

6.      Plaintiff alleges Defendants cannot present "any evidence sufficient to demonstrate that they will be able to meet their burden of proving the *affirmative defense* of consent on a class wide basis." Doc. 34 at 3 (emphasis in original). While this is factually inaccurate, the Fifth Circuit has held that this is "an issue irrelevant to [the] analysis." *Gene*, 541 F.3d at 327 ("Gene argues that BioPay must establish consent as an affirmative defense; BioPay argues that consent is an element of the cause of action. The district court did not decide this issue, and we do not concern ourselves with it either."); *see Jamison v. First Credit Servs., Inc.*, No. 12 C 4415, 2013 U.S. Dist. LEXIS 105352, 2013 WL 3872171, at *6 (N.D. Ill. July 29, 2013) ("Individualized issues necessary to decide an affirmative defense may predominate so as to prevent class certification. For purposes of class certification, it is [plaintiff's] burden to prove that they do not." (citations omitted)).

7.      It is Plaintiff's burden—not Defendant's—to establish the elements of class certification. It is Plaintiff's burden to show that both the consent issues and the standing issues can be resolved on a class wide basis. It is Plaintiff's burden to present a workable theory of answering these questions on a class basis. Plaintiff's proposed solution to this issue, to declare all of the consent invalid, only raises new individualized questions of fact regarding standing. As it is Plaintiff's duty

to prove the requirements of class certification and because Plaintiff cannot do so, class certification must be denied in this matter.

## FACTUAL BACKGROUND

8.      Rebuilt is a real estate investment company. As part of its business operations, it purchased and marketed homes for sale through various means, including the internet, emails, and text messaging. Exhibit A ¶ 3.

9.      Rebuilt begin using ClickSend as a texting platform in early 2022. *Id.* ¶ 7.

10.     At the time Rebuilt began to use ClickSend, Rebuilt operated a website through which individuals could input their contact information into a webform submission box to receive marketing materials, including text messages, from Rebuilt. *Id.* ¶ 15.

11.     In order to submit any information through this webform submission box, the individual had to consent to receiving marketing text messages from Rebuilt. *Id.* ¶¶ 15-20.

12.     In April of 2023, Rebuilt redesigned its website and its functionality. *Id.* ¶ 23-32. As part of this redesign, Rebuilt moved to a system whereby individuals would register for an account on the Rebuilt website. Id. As part of the account functionality on the new website, users could control their communication preferences, including whether to opt in or out of receiving text messages from Rebuilt. Id.

13.     In April of 2023, Rebuilt also changed its text messaging system to require two factor authorization to receive text messages. *Id.* ¶ 33-34. Under this system, when an individual submitted their telephone number to receive text messages, the system sent a text message to number at issue, after which the individual had to respond to the text message to confirm consent and continue receiving text messages. *Id.*

14.    According to information maintained by Rebuilt concerning the number ending in 1523, alleged to belong to Plaintiff, the account was registered by an individual with a name other than Plaintiff and other personal identify information, which does not match Plaintiff, via webform submission on July 1, 2022 at 8:13 a.m. *Id.* ¶ 37.

15.    This occurred before Rebuilt switched to the account-based web system. *Id.* ¶ 23.

16.    To the best of Rebuilt's knowledge, they had express written consent to contact every individual they texted, as 1) providing consent was necessary to submitting a request to receive marketing material under the old system, and 2) the new texting platform required two factor authorization to receive text messages, and 3) the account-based system had options to enable and disable consent. *Id.* ¶ 50.

17.    Rebuilt did not purchase any leads or contact information for any individuals from any lead generators or similar business. *Id* ¶¶ 14-15.

18.    Rebuilt did not intentionally text anyone that it knew it did not have consent to contact. *Id.* ¶¶ 42-45. Rebuilt only sought to contact individuals who might be interested in purchasing homes. *Id.* ¶ 45.

## ARGUMENTS AND AUTHORITIES

### A.  Standard of Law

19.    "The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348, 131 S. Ct. 2541, 180 L. Ed. 2d 374 (2011) (quotation marks omitted). To avail themselves of this exception, parties must satisfy the requirements of Federal Rule 23. *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 837 (5th Cir. 2012). More specifically, "[t]o obtain class certification, parties must satisfy Rule 23(a)'s four threshold requirements, as well as the requirements of Rule 23(b)(1),

(2), or (3)." *Id*. (quotation marks omitted). Rule 23(a), entitled "Prerequisites," sets out requirements applicable to all class actions, while Rule 23(b) outlines three "[t]ypes" of class actions with their own individual requirements. See Fed. R. Civ. P. 23.

20.    The requirements of Rule 23(a) are:

> the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Stukenberg, 675 F.3d at 837.

21.    As for the Rule 23(b) requirements, Plaintiff argues that class certification is appropriate under Rule 23(b)(3). Rule 23(b)(3) "embodies two requirements: (1) common questions must predominate over any questions affecting only individual members; and (2) class resolution must be superior to other available methods for the fair and efficient adjudication of the controversy." *Cruson v. Jackson National Life Insurance Co*., 954 F.3d 240, 252 (5th Cir. 2020) (quotation marks and brackets omitted).

22.    "Where the plaintiff seeks to certify a class under Rule 23(b)(3), the Rules demand a close look at the case before it is accepted as a class action." *Madison v. Chalmette Refining, L.L.C*., 637 F.3d 551, 554 (5th Cir. 2011) (quotation marks omitted). Regardless of which type of class the plaintiff chooses under Rule 23(b), a court must conduct a "rigorous analysis" of the Rule 23 prerequisites before certifying a class. *Castano v. American Tobacco Co*., 84 F.3d 734, 740 (5th Cir. 1996). Although "the strength of a plaintiff's claim should not affect the certification decision," the court must go "beyond the pleadings . . . , as [the] court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues." *Id*. at 744. Furthermore, "[t]he plain text of Rule 23 requires the court to 'find,' not merely assume, the facts favoring class certification." *Unger v.*

*Amedisys, Inc.*, 401 F.3d 316, 321 (5th Cir. 2005). The party seeking certification bears the burden of establishing that the requirements of Rule 23 have been met. *Cruson*, 954 F.3d 253.

**B. Plaintiff cannot establish the predominance requirement.**

23.    The predominance inquiry requires courts "to consider how a trial on the merits would be conducted if a class were certified." *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003) (citation and internal quotation marks omitted). The inquiry "entails identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class, a process that ultimately prevents the class from degenerating into a series of individual trials." *Gene*, 541 F.3d at 326. Rule 23(b)(3)'s predominance requirement is "far more demanding" than the commonality requirement of 23(a) because the predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Id.* (internal quotations and citations omitted).

*a.  Individualized issues of consent prelude this Court from certifying a class.*

24.    Multiple courts have recognized that "[i]ndividualized issues of consent often preclude class certification of TCPA" claims. *KHS Corp. v. Singer Fin. Corp.*, No. 16-55, 2018 U.S. Dist. LEXIS 143337, at *9 (E.D. Pa. Aug. 23, 2018) (citing *Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d 460, 470 (6th Cir. 2017); *Gorss Motels, Inc. v. Safemark Sys., LP*, No. 616CV01638ORL31DCI, 2018 U.S. Dist. LEXIS 58111, 2018 WL 1635645, at *6 (M.D. Fla. Apr. 5, 2018) ("[T]he issues of consent cannot be resolved without individualized inquiry, . . . and . . . class certification is [thus] inappropriate."); *Alpha Tech Pet Inc. v. LaGasse, LLC*, No. 16 C 4321, 2017 U.S. Dist. LEXIS 182499, 2017 WL 5069946, at *8 (N.D. Ill. Nov. 3, 2017) ("[T]he Court finds that individualized consent issues would require a series of mini-trials, thus defeating predominance and superiority."); *Brodsky v. HumanaDental Ins. Co.*, 269 F. Supp. 3d 841, 849

(N.D. Ill. 2017) ("[C]onsent issues defeat superiority and predominance . . . ."); *Forman v. Data Transfer, Inc.*, 164 F.R.D. 400, 404 (E.D. Pa. 1995) (determining that the "essential question of fact" was whether a fax was sent without express permission—a question that was "inherently individualized")).

25.     The Court should follow the Fifth Circuit's precedent in *Gene*, as it is directly on point in this matter. 541 F.3d at 326. In *Gene*, the evidence showed the defendant obtained at least some of the solicited phone numbers by consent and that the numbers had come from various sources. *Id.* As one court put it, "each number had its own story" and therefore issues of consent "could not be proven by general evidence." *Hirsch*, 337 F.R.D. at 130 (*citing Gene*, 541 F.3d at 328).

26.     In *Gene*, the Fifth Circuit highlighted three points which warranted denying class certification: (1) the defendant had produced evidence showing that it had obtained consent to send at least some of the faxes at issue and that there was no single database or record with which one could distinguish class members who had consented to receiving faxes from class members who had not; (2) the defendant had culled the numbers from a variety of sources over a period of time and not from a single source; and (3) "perhaps most importantly," the plaintiff had not met its burden to provide a "sensible method of establishing consent or the lack thereof via class-wide proof" and to present "facts or arguments to support that this type of dispute [over consent] w[ould] not exist as to a significant number of class members." 541 F.3d. at 323, 329. Since the plaintiff had "failed to advance any viable theory employing generalized proof concerning the lack of consent with respect to the class[,]" the Fifth Circuit concluded "that myriad mini-trials [could not] be avoided" and that certification of the class was improper. *Id.* at 329.

27.     The same issues present in *Gene* that warranted denying class are present in this case. It is not the case where Rebuilt received all of its numbers from one source or purchased a contact list

from a third-party vendor. Instead, individuals signed up to receive marketing messages from Rebuilt. Exhibit A. Different class members signed up for Rebuilt' s text messaging through different platforms, including some of which were subject to two factor authentication procedures. *Id*. ¶¶ 18-36. Rebuilt can determine when each individual number was added to its contact lists, as it did so with Plaintiff, identifying the exact date and time that Plaintiff's number was registered. *Id*. ¶ 37. Rebuilt can do this for other numbers and/or accounts, depending on when the individual either submitted his information or created an account (or did one and then the other). *Id*. ¶ 39. Rebuilt can further link these accounts to the unique IP addresses used to sign up for the account. *Id*. This database shows that every member consented, or at least the person who submitted the number provided consent, which Rebuilt assumes to be the individual who possessed the information. Rebuilt would not know if a person submitted a wrong number or someone else's number until the owner of that number contacted Rebuilt and told them, as in this case. *Id*. ¶ 42. These are fact intensive questions and would require a mini trial into each potential class member.

28.     Thus, just as in *Gene*, there is no one database or one analysis that can be undertaken to determine consent on a class wide basis based on this information. The database only shows consent for all numbers. Each number has its own story of how it ended up on Rebuilt's marketing list. This is illustrated by the story behind Plaintiff's number, who allegedly never consented to receive messages, got messages intended for another person—likely from an individual who did consent to receive messages and intended to direct messages to himself but entered his telephone number incorrectly. *See Burk v. Direct Energy, LP,* No. 4:19-CV-663, 2021 U.S. Dist. LEXIS 178408, at *16 (S.D. Tex. Sep. 20, 2021) ("In light of the individualized, fact-intensive disputes about consent that already permeate the record, the Court concludes that this case is governed by

the Fifth Circuit's *Gene* opinion."). Rebuilt has no way of determining whether a similar situation applies to any other account without conducting an investigation into each and every account.

29.     Plaintiff argues that "Defendants obtained the telephone numbers they texted from a single source: via submissions to a website marketplace: via submissions to a website marketplace." Doc. 34 at 5. This is inaccurate. The website was not the "source" of the numbers; they were the method by which the individual providing the information transmitted their information to Rebuilt, including their consent. The "source" of each number is the individual who inputted the information into webform submission and submitted the information to Rebuilt.

30.     When courts discuss obtaining numbers from one "source," they are referring to companies purchasing contact lists from vendors. *See Gene*, 541 F.3d at 327 (distinguishing *Kavu* because in that case, "Omnipak had obtained all of the fax recipients' fax numbers from a single purveyor of such information", whereas "BioPay culled fax numbers from purchased databases but also periodically culled fax numbers from various other sources" including internet submissions). Rebuilt did not purchase any contact lists from an individuals or business and did not use any lead-generating company to contact any individuals in the proposed class, and therefore did not obtain the contact information for the proposed classes members from a single "source." Rather, each number was submitted, with unique identifying information, by different individuals. Since each number "has it own story," there is no class wide proof capable of resolving the consent issue on a class wide basis. For these reasons, this Court should find that a class action is not superior in this matter and deny Plaintiff's Motion for Class Certification.

   b.  *Plaintiff's proposed theory to address consent creates further individualized issues.*

31.     Finally, Plaintiff has not met her burden to provide a sensible method of establishing consent or the lack thereof via class-wide proof or her burden to present facts or arguments to

support that this type of dispute over consent would not exist as to a significant number of class members. To avoid this issue, Plaintiff argues this Court should simply exclude and disregard *all* evidence of consent as invalid and find that *none* of the class members consented to receiving text messages from Rebuilt. Doc. 34. Plaintiffs have no evidence, and submit no evidence, that there is a lack of consent for each and every class member. *Id*.

32.    However, Plaintiff's legal analysis is flawed. *See Burk,* 2021 U.S. Dist. LEXIS 178408, at *16-17 ("In trying to avoid the outcome required by *Gene*, Burk repeatedly attacks the credibility of Direct Energy's evidence showing that individual class members gave consent to be contacted. But she does not show how the Court can use class-wide proof to determine the existence or absence of consent, and her attempts to do so rely on arguments that conflict with *Gene*, utilize distinguishable cases, or both."). Even if the Court dismisses all of Rebuilt's evidence of consent, Plaintiff's class action still fails because this would result in individualized questions of fact as to each class members standing.

33.    Plaintiff's argument is that all of the consent is invalid, but she does not show what class-wide proof to determine the existence or absence of consent. Doc. 34. Plaintiff's arguments largely rely on cases from outside the Fifth Circuit and she makes only a passing reference to *Gene & Gene*, the controlling Fifth Circuit case law on the issue. The cases Plaintiff cites to support her claims that "courts routinely certify" classes like this all originate from outside the Fifth Circuit. *Id.* at 13-14. If courts routinely certify classes like this in the Fifth Circuit, then Plaintiff should have cited to some of these Fifth Circuit cases, instead of cases from outside this circuit. To the extent Plaintiff's cited case law conflicts with *Gene*, it must be disregarded. *Id.*

34.    The case law cited by Plaintiff is also not on point. Plaintiff cites to *Hossfeld v. Allstate Ins. Co.* as a basis for this Court finding the evidence of consent to be hearsay. Doc. 34 (*Hossfeld v.*

*Allstate Insurance Co.* is factually on all fours with the case here); *Hossfeld v. Allstate Ins. Co*., 726 F. Supp. 3d 852, 873 (N.D. Ill. 2024). In *Hossfeld*, the evidence of consent Allstate relied upon was found to be hearsay because the spreadsheet evidence at issue was provided to an individual named Basit by a company named Atlantic, which Atlantic had received from another third party called KP Leads. The court found the evidence inadmissible based on "multiple layers of hearsay, for which no exception or exemption has been established . . . ." 726 F. Supp. 3d at 873. This is not the case in this instant matter, where the spreadsheets come directly from Rebuilt and are business records admissible under Federal Rule of Evidence 803(6). There is no multiple layers of hearsay in this matter as in *Hossfeld.* Further, Rebuilt can link each sign up to a unique individual IP address. Exhibit A ¶ 39.. Thus, these cases from outside the Fifth Circuit should be ignored as they violate Fifth Circuit precedent in *Gene. Burk,* 2021 U.S. Dist. LEXIS 178408, at *16-17.

35.    Plaintiff argues that consent is invalid because of a lack of compliance with the E-Sign Act. Doc. 34 at 16-20. Plaintiff presents no evidence as to how she will prove, on a class wide basis, the lack of valid consent on this theory, when there was multiple different methods in which members of the class could end up on the market list; multiple websites used by Rebuilt with different functionality and language used on the websites; two-factor authentication required for some class members, and other issues of individual fact that relate to each individual class member.[2] The fact that a large percentage of class members double consented to receiving text messages through the two-factor authentication process, show that Plaintiff's claims involving E-Sign do not apply across the class. *See Winner v. Kohl's Dep't Stores, Inc*., No. 16-1541, 2017 U.S. Dist. LEXIS 131225, at *19 (E.D. Pa. Aug. 17, 2017). Further, Plaintiff cannot offer any testimony regarding what information was displayed to users when consenting, as Plaintiff allegedly never

---

[2]

saw any of this information. Thus, the only information that can be presented would be Rebuilt's testimony, which is provided here and warrants against granting class certification.

36.     Plaintiff's proposal to deem all the consent invalid and proceed with a class composed of every person who received a text messaging from Rebuilt—regardless of whether these people wanted to receive the text messages or not and regardless of whether this—also raises individual questions as to these class member's Article III standing and ability to seek relief in federal court. *See also TransUnion LLC v. Ramirez*, 594 U.S. 413, 431, 141 S. Ct. 2190, 210 L. Ed. 2d 568 (2021) ("Every class member must have Article III standing in order to recover individual damages."). Plaintiff's theory relies on finding that Rebuilt failed to comply with the statutory provisions of the E-Sign Act, thus making all the consent Rebuilt received to make calls invalid. However, Plaintiff cannot prove, on a class wide basis, that all of the individuals who received text messages from Rebuilt did not want to receive the messages and therefore were harmed by the receipt of *unsolicited* text messages. Plaintiff also cannot prove, on a class wide basis, that none of the individuals who received text messages provided consent, albeit statutorily invalid consent (according to Plaintiff), to receive the messages. Thus, Plaintiff cannot show, on a class wide basis, that every class member suffered a concrete and particularized injury in fact sufficient to establish Article III standing under this theory. *See Elzen*, 2024 U.S. Dist. LEXIS 9079, at *13-14. (Van Elzen assumes that every insurance agent who received just one ringless voicemail from Advisors Ignite suffered the same harm he claims to have sustained as a result of receiving a message offering a way to substantially increase his income. That seems doubtful.")

37.     The receipt of *unsolicited* telemarketing text messages can constitute an injury under a standing analysis in the Fifth Circuit. *Cranor v. 5 Star Nutrition, L.L.C.*, 998 F.3d 686, 690 (5th Cir. 2021) ("Here, the text of the TCPA shows Congress determined that nuisance arising out of

*unsolicited* telemarketing constitutes a cognizable injury.") (emphasis added); *Gadelhak v. AT&T Servs.*, 950 F.3d 458, 462 (7th Cir. 2020) ("The harm posed by *unwanted* text messages is analogous to that type of intrusive invasion of privacy."). Plaintiff cannot show, on a class wide basis, that the entire proposed class received *unwanted* or *unsolicited* text messages. Plaintiff presents no class wide theory of actual damages resulting from Rebuilt's alleged harm, instead relying on the statutory damages provision of the TCPA.

38.     The Supreme Court of the United States recent opinion in *TransUnion*, 594 U.S. at 437, a class action brought under a different consumer protection statute, the Fair Credit Reporting Act (the "FCRA"), is instructive on this matter. The Supreme Court addressed a service offered by TransUnion which had inaccurately labeled people as being on the U.S. Treasury Department's Office of Foreign Assets Control's list of "'specially designated nationals' who threaten America's national security." *Id*. The Court's analysis focused on two classes, a larger class of 8,185 members who had been erroneously designated by Trans Union and a smaller class of 1,853 members who had their credit reports disseminated by TransUnion to potential creditors during the class period. *Id*. at 417.

39.     The Supreme Court held that the smaller class of 1,853 members had Article III standing because their reports had been disseminated to creditors. *Id*. However, the other members of the larger class did not have standing to sue, because the "mere presence of an inaccuracy in an internal credit file, if it is not disclosed to a third party, causes no concrete harm." *Id.* at 434.

40.     Relevant to this case, the Supreme Court first reiterated:

>       For standing purposes, therefore, an important difference exists between (i) a plaintiff 's statutory cause of action to sue a defendant over the defendant's violation of federal law, and (ii) a plaintiff 's suffering concrete harm because of the defendant's violation of federal law. Congress may enact legal prohibitions and obligations. And Congress may create causes of action for plaintiffs to sue defendants who violate those legal prohibitions or obligations. But under Article

III, an injury in law is not an injury in fact. Only those plaintiffs who have been concretely harmed by a defendant's statutory violation may sue that private defendant over that violation in federal court. As then-Judge Barrett succinctly summarized, "Article III grants federal courts the power to redress harms that defendants cause plaintiffs, not a freewheeling power to hold defendants accountable for legal infractions." *Casillas*, 926 F. 3d, at 332.

*Id*. at 426-27. The Supreme Court further warned that "if the law of Article III did not require plaintiffs to demonstrate a 'concrete harm,' Congress could authorize virtually any citizen to bring a statutory damages suit against virtually any defendant who violated virtually any federal law." *Id*.

41.     Applying those standards to that case, the court found that the members of the proposed class who had not had their credit reports disseminated to a third party had not been injured for the purposes of Article III standing. *Id*. Though the alleged violations and statutory basis for the action in *Rameriz* differs from this instant case, there are several similarities between the class without standing in that matter and Plaintiff's proposed class in this matter.

42.     The Supreme Court held "the plaintiffs did not present any evidence that the 6,332 class members [who did not have their disclosures disseminated to third parties] even *knew*" of the alleged violations under the FCRA. *Id*. (emphasis in original). The Supreme Court noted, "[i]f those plaintiffs prevailed in this case, many of them would first learn that they were 'injured' when they received a check compensating them for their supposed 'injury.'" *Id*. This is the same as in this case. The proposed class members who consented to receive text messages, even if they did not provide statutorily compliant consent as Plaintiff alleges, would first learn of their injury when they received class notice or settlement. Class members would receive compensation for receiving unwanted text messages despite those class members wanting those text messages and requesting Rebuilt send them those text message. In this case, as in *Rameriz*, Plaintiff did not "present evidence that the class members were independently harmed" by Rebuilt's conduct; Plaintiff

asserts only a claim for statutory damages on behalf of the class. *Id*. at 437. While Plaintiff can assert harm for the receipt of unsolicited claims, she has no evidence of harm on a class wide basis.

43.     Finally, the Supreme Court found no standing on the disclosure claim and the summary-of-rights claim. The plaintiffs alleged that Trans Union "deprived them of their right to receive information in the format required by statute." *Id*. at 440. The Supreme Court held the plaintiffs did "not demonstrate that they suffered any harm *at all* from the formatting violations." *Id*. (emphasis in original). Moreover, there was no evidence that the plaintiffs would have acted differently had the consent information been presented properly under E-Sign, and thus no evidence of harm sufficient to establish Article III standing. *Id.* This is absolutely zero evidence before the Court of any harm caused by the allegedly improper E-Sign disclosures.

44.     A court in the Eastern District of Wisconsin denied class certification in a telemarketing TCPA class action on these grounds. *Elzen*, 2024 U.S. Dist. LEXIS 9079, at *13-14. The Court first recognized, "the question is not simply whether Van Elzen was harmed; in order for Van Elzen's motion for certification of a class under Rule 23 to be granted, he must show that the members of the class he seeks to certify were similarly harmed." *Id.* (*citing Barrows v. Becerra*, 24 F.4th 116, 128 (2d Cir. 2022) ("'We do not require that each member of a class submit evidence of personal standing,' but 'no class may be certified that contains members lacking Article III standing.'" (*quoting Denney v. Deutsche Bank AG*, 443 F.3d 253, 263-64 (2d Cir. 2006))); *see also Adashunas v. Negley*, 626 F.2d 600, 604 (7th Cir. 1980) ("The second deficiency in the class action claims is that since the proposed class is so amorphous and diverse, it cannot be reasonably clear that the proposed class members have all suffered a constitutional or statutory violation warranting some relief. If the conceived injury is abstract, conjectural or hypothetical as here, instead of real, immediate or direct, the complaint fails to cite an actual case or controversy under Article III of

the Constitution." (*citing O'Shea v. Littleton*, 414 U.S. 488, 493-94, 94 S. Ct. 669, 38 L. Ed. 2d

674 (1974)).

45.    The court in *Elzen* succinctly exposed the flaws in that plaintiff's standing arguments, the

same flaws that are present in this case:

> Van Elzen assumes that every insurance agent who received just one ringless
> voicemail from Advisors Ignite suffered the same harm he claims to have sustained
> as a result of receiving a message offering a way to substantially increase his
> income. That seems doubtful. Advisors Ignite did not contract with SlyBroadcast
> because it wanted to harass or annoy potential customers. It no doubt thought that
> some number of insurance agents that received its message would be interested in
> learning of the services it offered that could significantly increase their income. And
> presumably some of the recipients of the messages it sent were happy to receive
> them. They may have even followed up by calling Advisors Ignite. Some may in
> fact have benefitted from receiving the information Advisors Ignite provided. Even
> those that did not call may have felt unharmed by learning of what was offered and
> were not annoyed or harmed. They may well have found the information worth the
> little effort it takes to delete a message after it is received.

*Elzen*, 2024 U.S. Dist. LEXIS 9079, at *15 ("The mere fact that Advisors Ignite may have violated

the TCPA in placing the messages does not mean that everyone who received one was harmed.").

This is the exact same situation in this case. Even if the Court accepts Plaintiff's arguments that

all of the consent is invalid, due to a failure of Rebuilt to comply with the requirements of the E-

Sign Act as it relates to obtaining consent under the TCPA in accordance with federal regulations

governing the same, then Plaintiff's class still fails, as Plaintiff cannot show Article III standing on

a class wide basis. Plaintiff's theory ignored that "presumably some of the recipients of [Rebuilt's]

messages it sent were happy to receive them" and that some may even have followed up with

Rebuilt regarding the property. *See Elzen*, 2024 U.S. Dist. LEXIS 9079, at *15. There is no manner

or method by which Plaintiff can present class-wide proof as to the Article III standing in this

matter, as Plaintiff cannot show that every class member received *unsolicited* telemarketing texts.

46.    Plaintiff cannot show a class action is superior in this matter. Plaintiff has not presented a viable way of determining consent on a class wide basis. First, Plaintiff does not account for the change in the system utilized by Rebuilt, which had different consent mechanism. Plaintiff who allegedly never provided consent, cannot testify to the consent issue in general. Second, Plaintiff has not provided a sensible method of establishing consent or the lack thereof via class-wide proof. If the Court accepted Plaintiff's argument that Plaintiff can show a lack of consent on a class wide basis by showing all the consent was invalid, this would raise issues at to the standing of each and every class members, as Plaintiff would only have shown a lack of consent due to failure to comply with certain statutory requirement; Plaintiff cannot show that all the class members did not want to receive these text messages and that they were harmed by the receipt of unwanted and unsolicited text messages. Plaintiff can only show, at best, that class members were not provided with certain statutory notices which could make their consent insufficient under federal regulations. However, Plaintiff cannot show any harm resulting from this violation, as undoubtedly some of these individuals consented to receiving text messages from Plaintiff and some class members received text messages and later successfully opted out without further complaint. Plaintiff, who allegedly received these messages without providing her number or consent, cannot testify as to any harm suffered by these people that resulted from them providing consent to be contacted but that consent was in a statutory invalid manner.

47.    Even if the Court strikes all evidence of consent, there is still the issue of the individual questions of Article III standing. Finding all consent invalid also raises individualized questions of fact as to whether any class member had an established business relationship with Rebuilt. The TCPA exempts liability for phone calls "to any person with whom the caller has an established business relationship." 47 U.S.C. § 227(a)(4). An "established business relationship" is defined as

"a prior or existing relationship formed by a voluntary two-way communication . . . on the basis of the subscriber's purchase or transaction with the entity within the eighteen . . . months immediately preceding the date of the telephone call." 47 C.F.R. § 64.1200(f); see also 16 C.F.R. § 310.2(q). The relationship can also be formed "on the basis of the subscriber's inquiry or application regarding products or services offered by the entity within the three months immediately preceding the date of the call." 47 C.F.R. § 64.1200(f); see also 16 C.F.R. § 310.2(q). Plaintiff does not present any evidence or argument as to how they plan to determine whether any individual class members have an established business relationship with Rebuilt, thus eliminating TCPA liability as to those class members. Any class members that have an established business relationship with Rebuilt would also have a different standing analysis that Plaintiff as well.[3]

48.      There are too many fact intensive questions in this matter for class action to be superior. There are individual questions of fact as to consent provided by the class members which Plaintiff has not addressed, and individual questions of fact as to standing to sue in federal court under Plaintiff's proposed theory. Both warrant finding a class action is not superior in this matter. For these reasons, Plaintiff's Motion for Class Certification must be denied.

   **C.  Plaintiff's claims are not common to the other class members.**

49.      Rule 23(a)(2) states that there must be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Before 2011, courts sometimes described the commonality threshold as "not high." *Gene*, 541 F.3d at 325. In 2011, the Supreme Court "heightened the standards for

---

[3] Plaintiff's Expert claims he removed "removed 136,810 text messages to numbers where there was an inbound message that had indicated a possible interest in the product or service offered by the Defendants." However, he offers no explanation of what sort of messages indicated a possible interest in product of services, how he determined this, or any other basis for this number. The footnote he cites lists numerous instances of individuals opting out, but oddly is silent as to what constitutes an "interested" text. Doc. 34-3 at 18. Even the SQL queries in the expert report do not indicate what an "interested" text is.

establishing commonality under Rule 23(a)(2)." *M.D. ex rel. Stukenberg*, 675 F.3d at 839 (*citing Dukes*, 564 U.S. at 350).

50.     What matters to class certification is not the raising of common questions but rather the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation." *Dukes*, 564 U.S. at 350 (emphasis in original). Thus, common questions do not cut it— the common questions must generate common answers that resolve issues central to the dispute. Under this heightened standard, the Court must review both the similarities among class members' claims and the dissimilarities. *Stukenberg*, 675 F.3d at 842-44; *see also Dukes*, 564 U.S. at 351 ("Dissimilarities within the proposed class are what have the potential to impede the generation of common answers."); *Chavez*, 957 F.3d at 547-49.

51.     "District courts must only certify class actions filed under the TCPA when" the plaintiff has advanced "a viable theory employing generalized proof to establish liability with respect to the class involved." *Gene*, 541 F.3d at 328.3 If a central issue turns on evidence specific to each class member, then class-wide resolution is not possible. *Id*. Generalized proof may not require evidence to come from a single source, but that is the likely method. *Id*. Whatever the method, the plaintiff must advance a theory that can establish liability on a class wide basis. *Dukes*, 564 U.S. at 356. No such theory or evidence exists in this case.

52.     Plaintiff's claims are not common of the class. First, there is no viable theory employing generalized proof regarding consent in this matter. Determining consent will require mini trials into each and every individual who signed up to determine whether they provided consent, whether that consent was valid, and whether that consent was ever revoked. Second, there are numerous other issues which require mini trials as well, including Article III standing.

53.     Plaintiff's claims are not common to the other class members for other reasons as well. Plaintiff alleges she never provided any consent; thus, her claims are not common to those that provided consent but received invalid notice under the E-Sign Act. Her claims are not common of those class members that signed up after April 2023, when the new system and new consent protocol went into effect. Her claims are not common to those who opted in, received text messages, the opted out but still received further text messages. Her claims would only have commonality with other individuals who received text messages intended for other recipients.

54.     Plaintiff's damages claims are also not common to the other individuals. Plaintiff cannot testify to consent in general; cannot testy as to how she was harmed by the lack of proper E-Sign notice; and Plaintiff cannot testify to the harm from continuing to receiving text messages after opting out. Importantly, Plaintiff cannot testify as to the harm these other individuals suffered from an alleged lack of proper E-Sign notice, as Plaintiff never visited the website or opted out.

55.     Plaintiff's claims are not common because there is no viable to conduct a class-wide proceeding to generate common answers to these questions of providing consent, whether the E-Sign notice was statutory sufficient, revocation of consent, and Article III standing. Plaintiff also lacks commonality with any claims for the alleged "subclass" in this matter involving individuals who allegedly opted in, received text messages, and then opted out. Plaintiff allegedly never opted in to any text messages, and she readily admits she never opted out of any text messages. Thus, Plaintiff cannot show her claims are common to the claims of these other class members, and she did not suffer the same alleged injury and cannot testify as to facts common to the smaller "subclass." For these reasons, class certification must be denied.

**D.  Plaintiff's claims are not typical of the other class members.**

56.     Typicality "focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent." *Stirman v. Exxon Corp.*, 280 F.3d 554, 562 (5th Cir. 2002) (*quoting James v. City of Dall.*, 254 F.3d 551, 571 (5th Cir. 2001)). "[T]he critical inquiry is whether the [named plaintiff's] claims have the same essential characteristics of those of the putative class. If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality." *Id.* (*quoting James*, 254 F.3d at 571). Much of the commonality analysis applies equally to typicality because, as the Supreme Court noted, the "commonality and typicality requirements of Rule 23(a) tend to merge." *Dukes*, 564 U.S. at 350, n. 5.

57.     As with the commonality analysis, Plaintiff's claims are not typical of the proposed class. Plaintiff alleges she never provided any consent; thus her claims are not typical of those that provided consent but received invalid notice under the E-Sign Act. Her claims are not typical of those class members that signed up after April 2023, when the new system and new consent protocol went into effect. Her claims would not be typical of anyone with a existing business relationship. Her claims would only have commonality with other individuals who received text messages intended for other recipients.

58.     Plaintiff's claims are not typical of the other class members because her legal and remedial theories are different from the other class members. Further, her theory as to Article III standing is necessarily different than any individuals that consented to receive texts but perhaps got statutorily invalid E-Sign notices or individuals who opted in and then opted out but continued to receive text messages.

59.     Plaintiff also lacks typicality with any claims for the alleged "subclass" in this matter involving individuals who allegedly opted in, received text messages, and then opted out.

Plaintiff's claims do not arise from a similar course of action. People that opted in and then withdrew their consent have experienced a different course of action than Plaintiff, who never opted in and never requested the text messages cease. Thus, the differences in the legal theory and factual background between Plaintiff and the alleged "subclass" show the Plaintiff's alleged claims are not typical of the alleged "subclass." For these reasons, class certification should be denied.

### E.  Plaintiff cannot establish numerosity because Plaintiff cannot show a class is ascertainable.

60.      A class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "Any class consisting of more than forty members should raise a presumption that joinder is impracticable." 1 Newberg, Class Actions § 3.05 at 3-25 (3d ed. 1992); *see also Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 624 (5th Cir. 1999) ("Although the number of members in a proposed class is not determinative of whether joinder is impracticable, the size of the class in this case-100 to 150 members—is within the range that generally satisfies the numerosity requirement."); *Boykin v. Georgia-Pacific Corp.*, 706 F.2d 1384, 1386 (5th Cir. 1983) (finding that the numerosity requirement would not be met by a class with 20 members but was met by a class with 317 members).

61.      Rebuilt alleges there are 13,115 members in the main class. Doc. 34 at 4. However, as Plaintiff cannot show a common theory of liability or damages among the class members, Plaintiff cannot establish the numerous requirements either. Class certification should be denied.

### F.  Plaintiff is not an adequate class representative due to the differences in her claims.

62.      To comply with Rule 23(a)(4)'s requirements, the movant must show that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requirement is met when: (1) class counsel prosecutes the action zealously and competently; (2) representative parties are willing and able to control the litigation and protect

absentee class members' interests; and (3) there are no conflicts of interest between the representative parties and the class members. *Slade v. Progressive Sec. Ins. Co.*, 856 F.3d 408, 412 (5th Cir. 2017). Rule 23(a)(4)'s adequacy inquiry "serves to uncover conflicts of interest between the named plaintiffs and the class they seek to represent." *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 625, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997).

63.    Plaintiff is not a proper representative of the class for the reasons stated herein. Plaintiff cannot show similar legal theories or injuries as class members who opted in but received allegedly statutorily noncompliant e-notice disclosures or class members who allegedly opted in then opted out but continued to receive text messages. The legal theories and factual claims of Plaintiff are different from the class members, and Plaintiff is not an adequate class representative.

64.    Plaintiff is also not a proper representative for the alleged "subclass" in this matter involving individuals who allegedly opted in, received text messages, and then opted out. Plaintiff does not fall into this class, does not have a claim that is typical or common to this class, and cannot provide any evidence to support Article III standing for these class members, as she did not suffer they same type of injury as these proposed class members. For these reasons, class certification should be denied.

## CONCLUSION

65.    Individual questions of fact predominate in this matter. Plaintiff cannot show that a class action is the superior method of resolving this matter because there are too many individualized questions of fact that would involve mini trials into each individual class member. Plaintiff cannot show a viable method of resolving the consent issues on a class wide basis; in fact, the theory Plaintiff does offer only opens further questions of individual fact into the standing of each proposed class member. Individuals who received text messages that they opted in to receiving,

regardless of whether they received proper notice under the E-Sign Act, were not harmed by Rebuilt and cannot be class members in federal Court. As Plaintiff cannot resolve these issues with her class, class certification should be denied in this matter.

WHEREFORE, PREMISES CONSIDERED, Defendants Rebuilt Brokerage LLC d/b/a Rebuilt Realty and Rebuilt Offers LLC, respectfully request this Court deny Plaintiff's Motion for Class Certification.

Respectfully submitted,

**MARTIN GOLDEN LYONS WATTS MORGAN PLLC**

*/s/ Xerxes Martin*
EUGENE XERXES MARTIN, IV
Texas State Bar No. 24078928
Email: xmartin@mgl.law
JACOB MICHAEL BACH
Texas State Bar No. 24100919
Email: jbach@mgl.law
**MARTIN GOLDEN LYONS WATTS MORGAN PLLC**
Northpark Central, Suite 1850
8750 North Central Expressway
Dallas, Texas 75231
TEL: (214) 346-2630
FAX: (214) 346-2631

***COUNSEL FOR DEFENDANTS***

**<u>CERTIFICATE OF SERVICE</u>**

This is to certify that a true and correct copy of the foregoing document has been forwarded via **CM/ECF** system to all parties entitled to notice of the same on this 21st day of April 2025.

*/s/ Xerxes Martin*
EUGENE XERXES MARTIN, IV